It pleases the Court, Your Honor. This is a petition for review from the Northern Immigration Appeals Decision Affirming the Immigration Judge ruling on an asylum application in which they did not give an opinion. Therefore, the Immigration Judge's decision is subject to review by this Court. Respondents, the husband and wife, Your Honor, they submitted the application for asylum with the INS and attached to the asylum application a statement of fact in which they briefly stated their reasons for the asylum. And at the end, they stated that they would provide detailed information about the persecution at the time of the interview. Only the male respondent was interviewed by the service. However, both were referred to the Court. At the emergency hearing, both testified in great detail about their fear of persecution and past persecution. The Immigration Judge, at the conclusion of the hearing, determined that the application for asylum was one day late. She had been filed on April 1, 1998. She was received by Immigration on April 2, 1998. One day or not, it was late, wasn't it? It was in fact late. Your Honor, the Code of Federal Regulations provides that if there is clear and convincing evidence that the application was mailed within the year period, then the date of mailing is considered to be the date of filing. This was brought to the attention of the judge. However, the judge insisted that the date of filing is the date that should be considered. In any event, the judge made two different credibility findings for female respondent and male respondent. She relied on her credibility findings on the statement of fact, stating that the female respondent failed to put in details her claim for past persecution, future persecution, and the application for asylum. Therefore, she's not credible. Assuming that everything that both of them testified to was credible, then why is it that what happened to them amounts either to past persecution or an objectively reasonable fear of future persecution? With regard to the female respondent, Your Honor, she took it upon herself to educate the female women who are oppressed, being harassed by their husbands, or being, let's put it this way, thrown out. And she was teaching them how to be independent, how to make their living, how to... And what happened to her was that she, that her place of business or help for these women was looted, and there were threats. We've frequently held that, and I don't mean to belittle it when I say just threats, because threats are bad things, but the threats alone do not suffice. So I just wanted to hear from you why you think this goes beyond that sort of normal... This went beyond threats. The attack on the women who were there at the time, learning how to do the sewing and stuff like that, were beaten and run away, and the place was destroyed and looted. And that's what was more than threats. Then the most important part is the Amnesty International report, which was submitted on the record, which clearly states that non-governmental organizations which set up income-generating programs, education and health care for the rural poor, particularly women, have been targeted by Islamists, as such organizations are seen by them to make women deviate from their Islamic lifestyle. Several of the NGO health centers and schools have been damaged or destroyed, and people associated with them have been attacked. And that's the bottom of the record. The judge did not take that into consideration, Your Honor. And I think that's clear evidence that there's substantial evidence she has been persecuted in the past, and future persecution is awaiting her if she returns back. I have a similar question with respect to him, and that is that his difficulty appears to be primarily business-related. That's correct, Your Honor. The folks who he got on the short end of turned out to be interested in politics, too. That's true, Your Honor. The most important part is that the immigration judge found out that he's credible, and that indeed, if he goes back, he will be harmed. Nevertheless, this was based on two motives. The first one is a business deal. The second one is a failure to support the group, I mean the political group. The other part, Your Honor, is that the judge ignored the relief under the Turkish Convention, which he does not really need to have any basis on protected grounds like it is on the asylum, and at least should have granted him withholding under the Turkish Convention. Thank you, Your Honor. Good morning, Your Honors. May I please the Court, Your Honor, ask Alicia Morris for Respondent John Ashcroft. First of all, let's address the torture issue. It wasn't raised. They did not ask for protection under the torture convention. They mentioned, they complained in their brief to the Board that they weren't granted torture convention, but there's a separate set of facts. It's a different burden of proof. The protection is different. What you're protected from is different, so it's a separate showing. They never made the showing. They cannot now, before this Court, say, well, we were denied CAT when they didn't apply for it. So that's waived. Second of all, they also waived the issue of the untimeliness. They didn't raise it to the Board, and they didn't raise it to the Court. Yes, indeed, the application was filed out of time. It was received on April 1st, and the judge made a specific finding that it was out of time. That was not challenged before the Board. It cannot be challenged before this Court. I don't believe it was even challenged in the brief. So now it's being raised for the first time before this Court. The fact is the immigration judge made the finding that they were ineligible for asylum. But why did the judge make that finding? It was sort of an, at least in my reading of it, and you can correct me if I'm wrong, it appeared as though the judge started to talk about timeliness and then said, well, I'm going to get to that later, and then never really made a finding. He said it was untimely, but there are reasons that might excuse it, and then went to merits. What do I make of that, or am I misreading it? Well, the way I read it, Your Honor, was that it was untimely, but she considered it in relation to the husband's application, because he had shown changed circumstances. The persons who were related, whom he believed instigated the incident, are now members of Parliament. So she found that changed country conditions affected his case, and she was willing, therefore, to accept the asylum application late, but not for the female respondent. All right. So how are we supposed to deal with that on review? Do we assume that that was the whole end of the case, and therefore we proceed with the husband's application and not the wife's? Oh, no, that doesn't mean it. But the wife is still eligible for consideration for withholding of removal, or yes, it was removal, for which she was considered. Now, withholding, again, you have to show clear probability. It's a higher standard. And she said I wouldn't, even if she were eligible, I wouldn't have found her eligible for, that she established eligibility for asylum, because she did, simply did not show, have a well-founded fear of persecution, which is absolutely true. First of all, there's no political motivation. Just because the goons who were sent to destroy her workplace were members of a religious group doesn't make it religious persecution or political persecution. Counsel cited from the Amnesty International reports, which I read very thoroughly, yes, there are horrible things that happened to the NGOs, but they were all in rural areas. She's in a major city. Did not happen in the city. None of this is documented. Do you read the immigration judge's decision as holding that even if she's in a situation where she's not eligible, and she's not eligible, and she's not eligible,  is that a determination essential to and a part of his determination that there was a failure of proof to show on persecution? Well, both, Your Honor. She did make the adverse credibility finding and said, you know, I really have a hard time believing that this happened because you have, you know, I've seen asylum applications. This is my question is whether whether that it's not outcome determinative. No, whether whether the it's hard for me to tell from reading the immigration judge's decision whether the judge is saying, well, she's not credible and therefore hasn't made out a case or whether he's saying she's not credible. But even if she were credible, she hasn't made out a case from column B. Even if she were credible, she hasn't made out a case. But I do want to put the adverse credibility in a little bit of context, which is, you know, we've all seen and the judge specifically said I've seen lots of asylum applications from people who can't speak English, can't and are illiterate in their own language, and they state their claim in their asylum application. She was troubled by the fact that a college educated woman who filled out the application on her own, fluent in English, where it says state your claim, doesn't take the opportunity to state her claim, and then goes to a hearing and says, well, I expected to say it in court. Why would she expect ever to get to court if she had she feels she has a great claim? She thinks the asylum officer is going to give it to her. She doesn't. There's something funny. And the judge didn't put her finger on it, and we don't have to either. But the point is, that was the context in which she hasn't established a clear probability of persecution. Because you have people, it was clearly the other tailors were worried because she had a successful business that was undermining them because they were underselling her. I mean, we're talking about on the waterfront, unfair labor practices. This happens all over. There was nothing political about it. She was very clear that the competing businesses, established businesses, were very, very resentful, and they were trying to put her out of business. And they did. But it wasn't on account of a political opinion or religion or social group. What happened was, they came and they put her out of business, and that was the end of it. They did not beat her workers. The workers stood aside, and it was only when they tried to stop them, and this is all hearsay on her part anyway, if credible, that they pushed them aside. They did not beat her workers. And the business is closed. And therefore, she has no well-founded fear of any kind of harm when she returns. Plus the fact, when she was there, what I find amusing is that she says, they weren't able to find me. All they could do was to threaten me over the phone because they didn't know where I lived. Well, if they didn't know where she lived in 1995, they're not going to know where she lives in 2003, even if she's kept the home. There's no indication that anyone's been to her home. Her home hasn't been looted, hasn't come to harm. We're willing to believe that she misspoke and said looting took place at the business and not at the home. But they were given two years to document everything. No matter how thoroughly destroyed the business was, surely one document existed. Two years to document this. They came with counsel, prior counsel, who on August 19th was given, no, October 30th, 1998 was given until August 19th, 1999, bring me some documentation. They showed up for the hearing on April 6th, 2000, no documentation. All we have are the country reports. Now, nothing's happened to anyone's family there. Country reports specifically say persecutors will, in this country, will go after the family. There's nothing happening to the family. Of course, these phone calls, but if indeed they're phone calls, nobody's ever come to harm here. The woman never came to harm. The business is closed. There's no reason to believe she'd come to harm for any reason if she goes back. The husband, yes, indeed, he did have a really unfortunate incident. It was one incident. It was isolated. It was not bad enough to reach level of persecution. Even if persecution, it wasn't on account of. Just because the perpetrator is a political person doesn't make it persecution on account of. He was very clear. He had a right to mine where they wanted to mine for profit, but he got pushed it through. They were embarrassed and they lost money, and that's why they went after him. He was very clear about that. Just because they were later elected to Parliament does not make it on account of. Why doesn't that raise an issue as to an objective fear of future persecution? I beg your pardon? Why doesn't that raise an issue? Your comments on account of may go to past persecution. The question I have is, why does not go to an objective fear of future persecution if the persecutors are now a member of the governing body? There's no, nothing in the record to show that anyone's interested in him for any reason. If even if you believe. We're not talking about, we're talking about these persecutors who beat him up, who are now members of the reigning political party. Why isn't that enough to at least raise a question on objective fear of future persecution, which I don't believe the IJ ever reached? Well, because they, I don't believe she found that there was a well-founded fear of persecution because there's no indication that anyone retains any interest in them. Nothing has happened. They talk vaguely of telephonic threats, but again, this is the country. Well, first of all, the law is, you know, family's ability to reside, continue to reside safely is an indication that they can reside safely. They stay there for several months afterwards. He himself said, I can only live in two cities. He doesn't say why, maybe he doesn't like to. Plus the fact that when the immigration judge asked, the only threats they ever got, except for this one incident years ago, which the mail responded were telephonic threats. And they were asked, why didn't you change your telephone number? It's too much trouble to do it in Bangladesh. It's easier to move the family to the United States. All they want, all they had were telephonic threats. They were never fulfilled when they were there. There's no indication that they continue. There's no indication that they would be fulfilled if they return. There's no indication that these two people who are now members of parliament, or at least were at the time of the hearing, continue to have any interest. It's over. He got the rights. They beat him up. That's an end to it. There's no indication they're still after him or still mad at him for getting the rights. They probably drilled somewhere else and probably beaten up other people for, you know, successfully and gotten their landmines. Of course we don't want to add because none of that's on the record and you're speculating. What I'm saying is there's no objective basis because there's no objective basis to believe that they're still mad at him. This happened in 1995. This is 2003. Anything is possible, but nothing is in the record to indicate that these two specific people still hold a grudge and are still willing to take action against him. Any further questions from the panel? Yes. What I saw in the female respondents' persecution, it was clear from the records not only that she's being attacked because of teaching the women, but she also spoke against the religion and they associated her with Tasliman Hussain, which was a female that was condemned to death by the Islamists because she spoke against religion. And this is very, very important because these people are very cruel and 95% of the population in Bangladesh is Muslim and they follow blindly the clerks and the imams and therefore the danger is there. As far as the conviction against torture, the Code of Federal Regulations 208.16 stated, the burden of proof is on the applicant for withholding removal under this paragraph to be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. Thank you, Rocky. Thank you very much. Case to serve will be submitted. Proceed to the next case on the oral argument calendar, which is 2 v. Ashcroft. Thank you.
judges: Canby, Rymer, Thomas